# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION


**SCOTT A. STANLEY,**

      **Plaintiff,**

**vs.**                             **Case No. 4:05cv300-MP/WCS**

**CARL BENNETT, et al.,**

      **Defendants.**

_____/


## REPORT AND RECOMMENDATION

Several motions for summary judgment are pending in this case.  Docs. 92, 103.
The first summary judgment motion was filed as a special report by Defendants Walker,
C. Davis, Lee, Phillips, L. Davis, Bennett, and Parramore.  Doc. 92.  The second special
report was filed by Defendant Schaub.  Doc. 103.  Both reports were construed as
motions for summary judgment in an order entered on October 25, 2007, and Plaintiff
advised of his obligation to file a response.  Doc. 104.  That order provided instructions
to Plaintiff as to what he must do to come forward with evidence to support his claims
and a date was set for taking the motions under advisement.  *Id.*  Since that time,
Plaintiff experienced difficulty in receiving legal mail and the summary judgment
deadlines were extended.  *See* docs. 117-121.  Defendants were requested to again

serve the summary judgment motion on Plaintiff by mid-March, 2008, and Plaintiff given more time to respond.  Doc. 121.

On March 6, 2008, Plaintiff filed a response to Defendant Schaub's summary judgment motion.  Doc. 122.  On March 31, 2008, Plaintiff filed a response to the summary judgment motion filed by the other Defendants.  Doc. 125.  Plaintiff was given an opportunity to receive some discovery, docs. 124, 129, and the deadline for submitting opposition to the summary judgment motion (doc. 92) was extended to June 20, 2008.  Doc. 129; *see also* doc. 136.  Plaintiff filed an amended response, doc. 132, to the summary judgment motion filed by Defendants Walker, C. Davis, Lee, Phillips, L. Davis, Bennett, and Parramore, doc. 92.

One final order was entered clarifying the documents submitted in this case and giving the parties sufficient time to respond.  Doc. 136.  After that order was entered, Defendant Phillips filed an amended affidavit, doc. 137, to be considered in support of the summary judgment motion, doc. 92.  Plaintiff filed another amended response to that summary judgment motion, doc. 92, on June 19, 2008.  Doc. 138.  Document 138 replaces documents 125 and 132.

In sum, the documents relating to these motions for summary are:

Plaintiff's second amended complaint, doc. 63;

Defendants' Walker, C. Davis, Lee, Phillips, L. Davis, Bennett, and Parramore motion for summary judgment, doc. 92, and the amended affidavit of Defendant Phillips, doc. 137, and Plaintiff's second amended response, doc. 138.

Defendant Schaub's motion for summary judgment motion, doc. 103, and Plaintiff's response, doc. 122.

**Allegations of the second amended complaint, doc. 63**

All of the events at issue in this case took place at the Leon County Jail where Defendants were employed and Plaintiff was housed.  It is now determined from evidence submitted by Defendants that Plaintiff was a pre-trial detainee at the time.

On December 4, 2004, Plaintiff alleges being placed in solitary confinement without a pre-confinement hearing, which Plaintiff contends violates his due process rights.  Doc. 63, p. 7.  Plaintiff was told he would be permanently housed there, and Plaintiff alleges he was in confinement in G-pod for about nine months.  *Id.*  Officially, Plaintiff was classified as being in administrative confinement.  *Id.*  Plaintiff apparently submitted several grievances concerning his status.  *Id.*  Plaintiff claims his telephonic communications were limited, thus, depriving him of the "assistance of counsel."  *Id.*

Plaintiff was placed in a medical observation cell on February 19, 2005, for two months, but returned to administrative confinement.  *Id.*, at 8.  Plaintiff told Defendants Walker and Bennett that he was autistic, had Asperger's Syndrome, and had special needs.  *Id.*  Plaintiff contends there is a psychiatric needs dormitory, but Plaintiff was denied placement there.  *Id.*

Plaintiff alleges the conditions of his confinement cell included roach infested rooms, cold food, radical climate variations, inoperable toilets and sinks, bodily fluids and waste stuck to the walls and windows with a horrible odor, broken windows, prisoners masturbating in sight of other prisoners, and prisoners throwing feces and urine across the dorm.  *Id.*, at 8.  Plaintiff alleges that on May 5, 2005, he advised Defendant Parramore about a problem with his toilet.  *Id.*, at 9.  Plaintiff claimed he "failed to correct the problem."  *Id.*  Plaintiff further alleged that Defendant Parramore

threatened physical harm to Plaintiff and during one escort, threw a pair of handcuffs at Plaintiff and slammed him against the wall while threatening to hurt Plaintiff if given the chance.  *Id.*, at 9.

On September 13, 2005, Plaintiff claims he was transported to the Leon County Courthouse by Defendant Phillips.  *Id.*, at 9.  Plaintiff was in full body restraints for nearly fifteen hours.  *Id.*  Plaintiff was also placed in a restraint chair by Defendants Davis, Parramore, and Walker.  *Id.*  Plaintiff claimed that Defendant Davis and Parramore "constantly disabled the water to [Plaintiff's] cell, making [his] toilet and sink inoperable, for punishment purposes."  *Id.*

At some unspecified point, Plaintiff was released but then re-entered the Leon County Jail in January, 2006, and again placed in administrative confinement (referred to by Plaintiff as solitary confinement) "without privileges, visitation, etc."  *Id.*, at 10. When Plaintiff "repeatedly requested" treatment for scabies, Defendant Schaub said "it was unnecessary to treat [Plaintiff] due to the fact [he] was in solitary confinement."  *Id.* When Plaintiff was returned back[1] to the Florida Department of Corrections he said he was prescribed 6 treatments over several months to treat his scabies, and has permanent scars.  *Id.*

Plaintiff claims that on February 16, 2006, Defendant Phillips "incited a physical altercation between" himself and officers from the Department of Corrections.  *Id.*, at 10. No further facts were presented to support that claim.

---

[1] It is unknown how long Plaintiff was at the Jail once he arrived in January, 2006.

Plaintiff alleges violation of his Eighth and Fourteenth Amendment rights.  *Id.*, at 11.  He also claims a violation of his Fifth Amendment right to counsel and to obtain evidence.  *Id.*, at 12.  Plaintiff seeks injunctive relief as well as compensatory damages. *Id.,* at 11.

In summary, Plaintiff brings the following claims from these allegations:

1.  Denial of Fourteenth Amendment due process in placement in solitary confinement without a hearing and monthly reviews.

2.  Denial of assistance of counsel and the right to obtain witnesses.

3.  Punishment in violation of the Eighth Amendment due to disciplinary measures taken, placement on suicide watch, failure to place in a psychiatric dormitory, and conditions of confinement, use of excessive force (battery by an officer), placement in restraints for 15 hours, disabling his water supply in his cell, refusal to treat "infestation of lice" (scabies), and inciting a physical altercation when Plaintiff arrived at the first Florida Department of Corrections institution.

4.  Violation of Florida Model Jail Standards.

## Rule 56 evidence

### Evidence from Defendants Bennett, C. Davis, Lee, Parramore, Phillips, and L. Davis, doc. 92

Plaintiff was housed at the Leon County Jail during various times in 2004, 2005, and 2006.  Defendant Walker, a Captain supervising the Administrative Bureau at the Jail, had a conversation with Plaintiff in which he explained that Plaintiff was "classified as a management problem inmate which authorized his housing assignment in Pod G

on administrative confinement."  Doc. 92, Walker affidavit, pp. 1-2 (doc. 92-3, pp. 1-2).[2]

Defendant Walker explained to Plaintiff that a hearing was not required before placing

him in administrative confinement because he was "not being disciplined."  *Id.*, at 2

(doc. 92-3, p. 2).  Plaintiff was housed there for safety reasons.  *Id.*  Plaintiff never

advised Defendant Walker that he was autistic or suffered from seizures.  *Id.*  Plaintiff's

screening documents upon his entrance into the Jail reveal that on three occasions, on

March 25, 2004, August 3, 2004, and November 2, 2005, Plaintiff denied suffering from

seizures.  *Id.*, at 2.  On two occasions, September 13, 2005, and January 6, 2006,

Plaintiff reported having seizures.[3]  *Id.*, at 2-3.  Medical personnel never made a

recommendation that Plaintiff be housed in a different area.  *Id.*  Nevertheless, Walker

further explained that he did not receive any recommendations from the medical staff

that Plaintiff be housed on Pod E, the mental health unit.  *Id.*, at 2.  He said that

Plaintiff's "behavior required that he be housed in a locked down unit," and Pod E was

not appropriate housing for him.  *Id.*  When Plaintiff sent a grievance requesting that he

be released from confinement to open population, Defendant Walker responded that

due to his "past history of violence toward" staff at the Jail, he would remain in

administrative confinement until transported to the Department of Corrections.  Doc. 92,

attachment to Walker affidavit (doc. 92-3, p. 29).

---

[2] References to the exhibits are made first to the paper copy and page number, followed by a reference (in parenthesis) to the corresponding document and page in the electronic docket.  Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

[3] The medical history forms were presented with Defendant Walker's affidavit, exhibit to doc. 92.  Doc. 92-3, pp. 7, 10, 16, 20, and 24.

Defendants presented a memorandum dated January 27, 2006, which directed that Plaintiff "remain in Pod G-2 under Administrative Confinement." Doc. 92, attachment to Walker affidavit (doc. 92-3, p. 28). The memorandum further explained that Plaintiff would have no "visitation except when authorized by the Jail Director or his designee." *Id.* No other restrictions were listed, and the memorandum specifically stated that Plaintiff would "continue to receive canteen, exercise, and phone privileges." *Id.*

Defendant Bennett, administrator of the Jail, submitted an affidavit stating that he had no personal involvement with Plaintiff during his incarceration, has never met Plaintiff, or personally spoken with him. Doc. 92, Bennet affidavit (doc. 92-2, pp. 1-2). Defendant Bennett's only involvement was in reviewing grievances Plaintiff appealed. *Id.*, at 2.

Similarly, Defendant Charles Davis submitted an affidavit recounting no "personal recollection" of Plaintiff, having "no personal contact with" Plaintiff while he was housed at the jail, and not having any involvement with Plaintiff. Doc. 92, C. Davis affidavit (doc. 92-4, pp. 1-2). Defendant C. Davis stated that he has "no personal knowledge of any of" Plaintiff's allegations in this case. *Id.*, at 2. Defendant C. Davis does acknowledge a memorandum which explained to Plaintiff his classification "as a management problem" and placement in administrative confinement because during an escort on May 10, 2005, Plaintiff bit Sergeant Parramore. *Id.*, at 2. Defendant C. Davis states that Plaintiff "was afforded due process with respect to his classification by pursuing the grievance process at the Leon County Jail, which [Plaintiff] did with respect to his complaint about his housing classification." *Id.* Attached to that affidavit is a

memorandum to Defendant Walker from Defendant Lee explaining that Plaintiff was classified as a management problem because, most recently, Plaintiff had "battered Sgt. Parramore by biting him during an escort."  Doc. 92, attachment to C. Davis affidavit (doc. 92-4, p. 4).  Another memorandum related that due to Plaintiff's housing status in administrative confinement, televisions are not allowed in Pod-G "due to safety precautions."  Doc. 92, attachment to C. Davis affidavit (doc. 92-4, p. 6).  Additionally, newspapers are not allowed in inmate rooms and, thus, Plaintiff could not receive a newspaper.  *Id.*

Defendant Lee, a Sergeant at the Leon County Jail, submitted an affidavit noting he is "professionally acquainted" with Plaintiff and recalls Plaintiff grieving his being housed in Pod-G under administrative confinement.  Doc. 92, Lee affidavit (doc. 92-5, p. 1).  Defendant Lee states that Plaintiff's file "included several entries of misconduct that supported his classification, including a battery on Sgt. William Parramore."  *Id.*, at 1-2.  Defendant Lee also explained that Plaintiff's assignment as a management problem and being housed in administrative confinement did not require a due process hearing.  *Id.*, at 2.

Defendant Lee's affidavit explained that on or about May 12, 2005, Plaintiff complained that he was deprived of water in his cell.  *Id.*, at 2.  Another inmate in a nearby cell (G-29) had flooded his cell and his water was restricted so that he could not again flood his cell.  *Id.*  Plaintiff, housed in cell G-31, had his water "affected when the water was disabled in cell G-29."  *Id.*  Upon receiving Plaintiff's request concerning the water, the pod officers turned on the water for Plaintiff.  *Id.*  Defendant Lee determined that Plaintiff was not deprived of water as he alleged (Plaintiff alleged he had been

intentionally moved to the cell where the water had been cut off).  Doc. 92, attachment to Lee affidavit (doc. 92-5, p. 15).

Plaintiff's grievance about being left in a holding cell for a lengthy period of time was also responded to by Defendant Lee.  *Id.*, at 2-3.  Defendant Lee submitted a memorandum explaining that all inmates who have court appearances "before 1400 hrs. are picked up in the morning and that the conditions in the holding cell as well as the amount of time inmates can be held in the holding cell was in compliance with the Florida Model Jail Standards."  *Id.*, at 3.

Sergeant Parramore has also filed an affidavit.  Doc. 92, Parramore Affidavit (doc. 92-6).  Sergeant Parramore denies having threatened Plaintiff or having thrown handcuffs at him.  *Id.*, at 1.  Parramore admits that on May 5, 2005, he pushed Plaintiff against the wall after Plaintiff bit him.  *Id.*  Parramore avers that "Inmate Stanley was charged and convicted of battery on a law enforcement officer and resisting with violence as a result of that incident."  *Id.*

Parramore states that Plaintiff was placed in a restraint chair on one occasion "as a result of his disruptive behavior . . . ."  *Id.*, at 2.  Parramore has no personal knowledge or information that Plaintiff suffers from seizures or that he reported to any correctional officer at the jail that he suffered from seizures.  *Id.*  Parramore also states:

> Before an inmate is placed in the restraint chair, the medical personnel in the Leon County Jail are consulted to determine that there are no indications in the inmate's medical file that would make it inappropriate or harmful for an inmate to be placed in the restraint chair.

*Id.*

Parramore avers that he did not know that the toilet in Plaintiff's cell did not work and he states that Plaintiff never reported such a problem to him.  *Id*.  Parramore states that if the toilet had been inoperable, Plaintiff would have been moved to another cell pursuant to jail policy.  *Id*.  Parramore denies that he disabled the water to Plaintiff's cell, and he had no knowledge of whether the water was turned off.  *Id*.

Parramore states that on August 19, 2005, the phone in Pod G-2 may have been turned off because he had just returned to work after an absence of seven weeks and was not aware that phones could be turned on from 1700 hours to 500 hours.  *Id*.  Parramore states that when he became aware of the policy, he turned the phones on.  *Id*.

Deputy Sheriff Bobby Phillips states in his affidavit that he works as a transportation officer, taking prisoners to and from court.  Doc. 137, Phillips Amended Affidavit (doc. 137-2, p. 1).  He had no recollection of having transported Plaintiff; the vehicle can carry about 40 prisoners at a time.  *Id*., at 2.  All prisoners are transported in full restraints, including handcuffs and leg irons.  *Id*.  When they arrive, they are placed into court holding cells.  *Id*.  Phillips said that he does not remain with the prisoners at the courthouse, and the amount of time that they remain there is not within his control.  *Id*.  Phillips had no authority over, or involvement in, the decision to place restraints upon Plaintiff during transport.  *Id*.  Phillips had a physical altercation with Plaintiff and criminal charges were filed against Plaintiff.  *Id*.  On February 16, 2006, records reflect that Captain Tom Cone and he transported prisoners, including Plaintiff, to the Florida Department of Corrections.  *Id*., at 3.  Phillips had no knowledge of or involvement in

any incident that happened at the Florida Department of Corrections when Plaintiff arrived.  *Id*.

Lieutenant Leod Davis works at the jail.  Doc. 92, L. Davis Affidavit (doc. 92-8, p. 1).  Davis states that on February 19, 2005, Plaintiff was placed into the restraint chair because he cut his face with an unknown object and was bleeding around his eyes, but he had no knowledge that Plaintiff suffers from seizures.  *Id*., at 1-2.  Davis states that Plaintiff was known to harm himself and others.  *Id*., at 2.  L. Davis states that medical staff determine whether a prisoner has a medical problem before the prisoner is placed into the restraint chair.  *Id*.  Attached to the L. Davis affidavit is a lengthy report dated February 19, 2005, detailing how and why Plaintiff was placed into the restraint chair. *Id*., at 6-9.  Plaintiff cut himself twice that day, and each time, officers took him to the medical department for treatment.  *Id*., at 7.  Nurse Marie Batson was present when the restraints on the chair were adjusted.  *Id*.  The report states: "Inmate Scott is housed in medical room 520-B under direct supervision."  *Id*.  The restraints were checked periodically thereafter by Nurse Batson.  *Id*., at 12.  At 0210 hours, Plaintiff left the chair to use the bathroom and to eat breakfast, refused to get back into the chair, was tased by a correctional officer, and was placed back into the chair.  *Id*.

On July 19, 2005, Plaintiff had written a letter stating that he was extremely depressed, suicidal, unstable and might act out his thoughts.  *Id*., at 13.  He was again placed into the restraint chair.  *Id*.  The letter is in the record.  *Id*., at 17.

L. Davis denies that he cut off water to Plaintiff's cell.  *Id*., at 2.  He states that on June 1, 2005, he had to cut off water to cells 29 and 31 in Pod G-2.  *Id*.  However, Plaintiff on that day was housed in cell 46 and was not affected.  *Id*. and p. 21.  It is

noted that when Plaintiff grieved this matter, he did not assert that he was housed in either cell 29 or 31.  *Id.*, at 23.

**Evidence from Defendant Schaub, doc. 103**

Defendant Michelle Lane Schaub is a registered medical assistant.  The only allegations concerning Defendant Schaub are found in paragraph 13 of Plaintiff's complaint, that at some time after January, 2006, she told Plaintiff that it was not necessary to treat his scabies because he was in confinement.

Schaub states in her affidavit that she is a registered medical assistant.  Doc. 103, Schaub Affidavit (doc. 103-3, p. 1).  Schaub works night shifts dispensing medication to over 300 prisoners.  *Id.*, at 2.  She has no authority to give prescription medication without orders from a doctor.  *Id.*  With certain exceptions not relevant here, the only way that she can respond to a request for medication is to give the prisoner a sick call form.  *Id.*  However, Schaub does not hand out sick call forms in G-pod.  *Id.* These are handed out by security officers.  *Id.*  Schaub does not recall that Plaintiff asked for medical treatment or medication for scabies.  *Id.*, at 3.  Attached to her affidavit is a sick call form filled out by Plaintiff on January 31, 2006, but Schaub does not remember receiving the form.  *Id.*  On this form, Plaintiff said that he had "small red bumps on my arms, legs, feet and thighs that itch extremely bad and then once scratched turn larger and explode with a clear liquid."  Doc. 103-4, p. 5.  Schaub states that unless it was an emergency, such as chest pains, trauma, or stroke symptoms, it is her duty to return a sick call form such as this one to the Sick Call Nurse for action. Doc. 103-3, p. 3.  She states: "Apparently I did transmit this specific form as Jennifer Frost responded to it on February 1, 2006."  *Id.*  In the staff section, Michelle Lane

(Schaub's maiden name) signed that at 2036 hours, during the night shift, she referred the request to the "NSC," which must be the Sick Call Nurse.  Doc. 103-4, p. 5.  The next day, Jennifer Frost noted "HC ordered" on the form, which is hydrocortisone cream.  *Id.*, and pp. 6 and 25.  On February 8, 2006, Plaintiff wrote a formal grievance that the hydrocortisone cream was not working.  *Id.*, at 30.  There is no evidence that Schaub had anything to do with answering that grievance.  On February 11, 2006, Plaintiff sent another inmate medical request form stating that "I have chiggers or some type of mite all over my body.  Cortisone cream doesn't work, you have to kill the little bastards."  *Id.*, at 29.  Nurse Jennifer Frost took this request, not Defendant Schaub.  *Id.* Finally, Schaub avers that she never told Plaintiff that he would never be treated for scabies though it is possible she told Plaintiff that she herself could not provide the treatment without a doctor's order.  Doc. 103-3, p. 4.

**Plaintiff's evidence**

Plaintiff's responses to the two motions for summary judgment, documents 138 and 122, are not under oath and do not contain Rule 56(e) evidence.  Plaintiff simply presents argument.  The earlier responses, documents 125 and 132, were similarly defective.

Plaintiff has, however, attached the affidavit of inmate Tori Storms to his response.  Doc. 138, p. 23.  Storms avers that on May 5, 2005, he heard Plaintiff, who was in room 31, yelling "about killing himself," and this was not the first time he had done this.  *Id.*  Storm avers that he overheard Sergeant Parramore saying that he hoped Plaintiff did kill himself.  *Id.*  He also states he heard "Nurse Michelle Lane" (Schaub) say: "Speak up, I can hear over him dying so loudly."  *Id.*  Storms avers that Plaintiff told

Parramore that he cut himself with a piece of glass.  *Id.*  He avers that Parramore said

that if he had to take Plaintiff to the medical department he would shoot him with a

taser.  *Id.*, at 24.  Storms states that he understood that Parramore had a job to do, "but

childish reactions such as this should not be tolerated in an institution such as this."  *Id.*

After Parramore left, Storms says that Plaintiff said he cut himself twice.  *Id.*  Twenty

minutes later, Parramore came back and took Plaintiff out of the cell.  *Id.*  Parramore

and Plaintiff yelled at each other as they exited the area.  *Id.*, at 25.

Plaintiff has also attached a psychological evaluation used to determine Plaintiff's

competency to stand trial.  Doc. 138, p. 27.  The evaluation is not dated, but apparently

it was for an Alabama criminal prosecution.  *Id.*, at 28.  The assessment is that Plaintiff

suffers from Asberger's Disorder.  *Id.*, at 27.  This disorder is "characterized by

communication difficulties, frequent misperceptions in social situations, anger control

problems, and frequent episodes of social anxiety and related misperceptions in social

situations."  *Id.*

**Legal analysis**

> **Denial of Fourteenth Amendment due process by placement in
> solitary confinement without a hearing and monthly or periodic
> reviews**

Defendants argue that Plaintiff was "classified as a management problem as a

result of his behavior."  There is no genuine dispute that Plaintiff was a serious

behavioral problem during his pretrial stay at the Leon County Jail.  Plaintiff was

convicted on two separate occasions of criminal assaults upon law enforcement

officers.  He was placed in a restraint chair due to his disruptive behavior and was

monitored by health care staff.  Plaintiff cut himself and had to be placed on suicide watch.

The real issue, though, is whether Plaintiff was entitled to procedural due process relating to the classification, and if so, whether he was afforded procedural due process. Defendants argue that Plaintiff "did not require that he be provided with a hearing inasmuch as he was not being disciplined."  Doc. 92, p. 2.  Defendants argue that a "hearing prior to such classification and housing assignment was not required."  *Id.*, at p. 3.  Defendant argues that Plaintiff filed grievances with respect to his confinement to Sergeant Lee, Captain Walker, and Major Bennett and thus, "received the due process to which he was entitled."  *Id.*  See also pp. 6-10.

The first question is whether the evidence before this court will support Plaintiff's contention that he had a liberty interest protected by due process in not being placed into the type of administrative confinement that he experienced for about nine months.

> The Supreme Court has identified two situations in which a prisoner can be further deprived of his liberty such that due process is required. The first is when a change in the prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court.  *See Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Vitek v. Jones*, 445 U.S. 480, 492-93, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (holding that a prisoner is entitled to due process prior to being transferred to a mental hospital).  The second situation is when the state has consistently bestowed a certain benefit to prisoners, usually through statute or administrative policy, and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. at 2300; *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prisoners may not be deprived of statutory "good-time credits" without due process).  In the first situation, the liberty interest exists apart

from the state; in the second, the liberty interest is created by the state.
*Bass*, 170 F.3d at 1318[4].

Kirby v. Siegelman, 195 F.3d 1285 (11th Cir. 1999).

In Magluta v. Samples, 375 F.3d 1269 (11th Cir. 2004), the prisoner, a pretrial detainee, had been in administrative detention for more than 500 days.  375 F.3d at 1275.  The prisoner alleged that he had not been afforded the same rights as prisoners in general population, that is, his cell was "closet-size," he was unable to communicate with other prisoners, meals were pushed through the cell door on trays, and while he was allowed limited social or legal visits, he was not permitted to have a job, participate in religious services, or attend educational classes, all in violation of Defendant's rules that inmates in administrative detention are to enjoy the same privileges as those in general population.  *Id*.  The plaintiff also alleged that he did not have periodic reviews of his confinement status.  The trial court had granted a motion to dismiss, and this ruling was reviewed on appeal.

The first issue was whether the allegations were sufficient to show intent to punish.  As to that issue, the court said:

> Due process requires that a pretrial detainee not be punished prior to a lawful conviction.  *Bell v. Wolfish*, 441 U.S. at 535, 99 S.Ct. at 1872; *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir.1996), *amended by*, 101 F.3d 1363 (11th Cir.1996).  However, the government may detain individuals to ensure their presence at trial and may subject them to the conditions and restrictions of the detention facility so long as those conditions and restrictions do not amount to punishment.  *Bell v. Wolfish*, 441 U.S. at 536-37, 99 S.Ct. at 1873.  The determination of whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate government purpose.  *Id*. at 538, 99 S.Ct. at 1873; *McMillian*, 88 F.3d at 1564.

---

[4] Bass v. Perrin, 170 F.3d 1312, 1318 (11th Cir. 1999).

*Id.*, at 1273.  "[A]n 'intent to punish may be inferred when a condition of pretrial

detention is not reasonably related to a legitimate governmental goal.' " *Id.*, at 1376-

1277.  Taking the allegations as true, the court held that the conditions as alleged

showed an intent to punish in violation of due process.  *Id.*, at 1277.

The court also held that the conditions as alleged by the plaintiff there were

sufficiently atypical to establish a liberty interest for purposes of entitlement to

procedural due process.  *Id.*, at 1282, *citing*, Sandin v. Conner, 515 U.S. 472, 115 S.Ct.

2293, 132 L.Ed.2d 418 (1995).  The court concluded:

> [W]e conclude that ample federal law existed at the time of the challenged
> conduct [1991 to 1995] to give fair warning to the defendants that it was
> unconstitutional to hold Magluta in solitary confinement for 500 days for
> the purpose of punishment and with virtually no procedural protection in
> the form of periodic reviews.

*Id.*, at 1283.

In contrast, in Al-Amin v. Donald, 165 Fed.Appx. 733 (11th Cir. 2006) (not

selected for publication in the Federal Reporter, No. 05-13803), the plaintiff had been in

administrative segregation for approximately three years.  165 Fed.Appx. at 735.  He

had been placed there because he had been convicted of murdering one deputy and

wounding another, was serving a life sentence, and was deemed to be an escape risk.

*Id*.  The court held that:

> Confinement to administrative segregation, under conditions substantially
> similar to those experienced by the general population of the prison, does
> not implicate liberty interests in the way that involuntary transfer to a
> mental hospital or involuntary administration of psychotropic drugs does.

*Id.*, at 738.  The court further held:

> Although Al-Amin has been confined in administrative segregation for a
> long time, because this confinement has occurred under conditions

> substantially similar to those experienced by the general population of
> GSP [Georgia State Prison], his confinement in administrative segregation
> does not unexpectedly exceed his sentence in a manner that would evoke
> the protections the Due Process Clause.

*Id.*  The court further noted that "periodic review was conducted in Al-Amin's case."  *Id.*, at 739.  The plaintiff's status was subject to monthly review, with a procedure for an appeal, and therefore, said the court, the "confinement does not appear to be a pretext for indefinite confinement, which might give rise to a liberty interest."  *Id.*  The court also held that there was no state-created due process liberty interest because the plaintiff was afforded conditions that were equivalent to those of the general population, and therefore the conditions were not an "atypical and significant hardship."  *Id.*

Plaintiff alleged that the conditions of his confinement were terrible, and posed a hardship that was not the same as pretrial detainees in open population, but he has not come forward with any evidence to support these allegations.  Defendants have shown without dispute either that the water in Plaintiff's cell was only temporarily shut off due to problems with a prisoner in the adjacent cell, or that Plaintiff was not even in the cell that suffered the loss of water.  Defendants have also shown that the only privilege that Plaintiff lost by being in administrative confinement was visitation, but even that was qualified as he could have visitation if authorized by the Jail Director or his designee. Further, while there was no formal periodic review of Plaintiff's status, Plaintiff's status was in fact periodically reviewed by means of responses to his grievances.  Plaintiff, therefore, has not shown a denial of due process.  Summary judgment should be granted to Defendants as to this claim.

**Denial of assistance of counsel and to obtain witnesses**

Plaintiff has come forward with no evidence to explain what he means by a denial of the right to obtain witnesses.  The denial of assistance of counsel appears to relate to the lack of access to a telephone.  Parramore states that on August 19, 2005, the phone in Pod G-2 may have been turned off because he had just returned to work after an absence of seven weeks and was not aware that phones could be turned on from 1700 hours to 500 hours.  *Id*.  Parramore states that when he became aware of the policy, he turned the phones on.  *Id*.  Thus, at most this appears to relate to lack of telephone access during the evenings.  Plaintiff presumably had a lawyer to represent him at this time, and his lawyer undoubtedly had access to Plaintiff.  The claim is unsupported and frivolous.

**Punishment in violation of the Eighth Amendment**

**Failure to place in a psychiatric dormitory**

There is no medical evidence that Plaintiff needed to be housed in a mental health facility.  The claim is unsupported.

**Conditions of confinement**

There is no evidence that the conditions in Plaintiff's cell violated the Eighth Amendment.  The only evidence concerns the water supply to the cell, and Defendants have adequately explained what occurred.  This did not violate the Eighth Amendment.

**Use of excessive force (battery by an officer)**

Plaintiff was convicted of twice assaulting an officer.  There is no evidence that any officer assaulted him.

**Medical treatment of an "infestation of lice" (scabies)**

At most, Plaintiff has shown that the medical staff at the Jail did not properly diagnose his outbreak of scabies.  A simply incorrect diagnosis of a skin condition due to negligence does not violate the Eighth Amendment.   Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

**Inciting a physical altercation when Plaintiff arrived at
the first Florida Department of Corrections institution**

Plaintiff has come forward with no evidence, and Defendant's evidence refutes the claim.

**Violation of Florida Model Jail Standards**

This is a state law claim, and does not violate the federal constitution.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendants' motions for summary judgment, docs. 92 and 103, be **GRANTED** and the Clerk be **DIRECTED** to enter summary judgment in their favor.

**IN CHAMBERS** at Tallahassee, Florida, on September 17, 2008.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**